**MITE CORPORATION and Mite Holdings, Inc., Plaintiffs–Appellees,**

v.

**Alan J. DIXON, Defendant–Appellant.**

**No. 79–1267.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 1979.

Decided Oct. 17, 1980.

As amended Dec. 3, 1980.

Russell Grimes, Jr., Asst. Atty. Gen., Chicago, Ill., for defendant–appellant.

Jerold S. Solovy, Jenner & Block, Chicago, Ill., for plaintiffs–appellees.

Before SPRECHER and CUDAHY, Circuit Judges, and DUMBAULD, Senior District Judge.*

* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

488

CUDAHY, Circuit Judge.

The possibility–and perhaps probability–that different levels of government will take quite dissimilar approaches to similar problems is inherent in federalism. But these divergences are not necessarily dysfunctional; the states in our federal system have long served as laboratories of social experiment–free, within limits, to evolve strategies of their own to meet pressing problems. State prerogatives, however, must remain necessarily circumscribed by the unifying requirements of the national authority as fixed in the Constitution. When Congress has spoken definitively (within its constitutional sphere), state legislatures may not act to obstruct or unsettle the congressional design.

The appeal in the instant case presents the enduring problem of defining the limits of state power within the constraints of national legislation–here involving securities regulation. Specifically, the question before us is whether the Illinois Business Take–Over Act, Ill.Rev.Stat. ch. 121½ § 137.51 *et seq.* (1979) (the "Illinois Act" or the "Act"), both facially and as applied, may stand under the supremacy and commerce clauses of the United States Constitution and the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78a *et seq.* (1976), as amended by the Williams Act.[1] The district court held the Illinois Act to be unconstitutional. We affirm.

## I. FACTS

The basic facts relevant to this appeal though lengthy are undisputed. Plaintiffs–appellees MITE Corporation and MITE Holdings, Inc., are Delaware corporations with their principal executive offices in New Haven, Connecticut. MITE Holdings, Inc. is a wholly–owned subsidiary of MITE Corporation (collectively, "MITE"). Defendant–appellant Alan J. Dixon is the Secretary of State of Illinois and is charged

with the administration and enforcement of the Illinois Act. Chicago Rivet & Machine Co. ("Chicago Rivet"), a defendant below but not a party to this appeal, is a publicly–held Illinois corporation with its principal executive offices in Bellwood, Illinois. Chicago Rivet has 866,264 shares of common stock outstanding and 2,181 shareholders of record. Of those shareholders, 589 are residents of Illinois, and they collectively own 377,395 common shares. Chicago Rivet's common stock is traded on the American Stock Exchange.

The scenario for the ensuing legal confrontations opens on January 19, 1979, with MITE preparing to commence a cash tender offer[2] for all outstanding shares of Chicago Rivet common stock. Pursuant to Section 14(d)(1) of the Williams Act, 15 U.S.C. § 78n(d)(1) (1976), and Regulation 14D promulgated thereunder, MITE filed a Schedule 14D–1 with the Securities and Exchange Commission (the "SEC"). The Schedule 14D–1 indicated MITE's willingness to pay $28.00 per share for all shares of Chicago Rivet common tendered to it, a premium of more than $4.00 per share over the market price in the period immediately preceding announcement of the offer.

The same day it filed its Schedule 14D–1 with the SEC, MITE also commenced the instant action in the district court, seeking to have the Illinois Act declared null and void on its face because it violated the supremacy and commerce clauses of the United States Constitution. In addition, MITE sought a temporary restraining order, a preliminary injunction and a permanent injunction prohibiting Secretary of State Dixon and Chicago Rivet from enforcing the Illinois Act against it in connection with the proposed tender offer.

The scene then shifted to the courts of Pennsylvania. On January 22, 1979, Chicago Rivet filed a complaint in equity in the Court of Common Pleas of Blair County,

1. Pub.L.No.90–439, 82 Stat. 454 (codified at 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f) (1976)).

2. "A tender offer has been conventionally understood to be a publicly made invitation addressed to all shareholders of a corporation to

tender their shares for sale at a specified price." Note, *The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934*, 86 Harv.L.Rev. 1250, 1251 (1973).

Pennsylvania, seeking to enjoin MITE from proceeding with its proposed tender offer because MITE was purportedly in violation of the Pennsylvania Takeover Disclosure Law, 70 Pa.Cons.Stat.Ann. tit. 70, § 71 *et seq.* (Purdon Supp. 1978) (the "Pennsylvania Act"). Chicago Rivet alleged that MITE's proposed tender offer was subject to the Pennsylvania Act because Chicago Rivet had its principal place of business and substantial assets in Pennsylvania. The court granted Chicago Rivet the relief it requested, issuing an *ex parte* order enjoining MITE from proceeding with the tender offer pending a further hearing on January 26, 1979.

In addition to initiating its action in Blair County on January 22, 1979, Chicago Rivet that same day also filed a complaint before the Pennsylvania Securities Commission, requesting that that Commission enforce the Pennsylvania Act against MITE. Meanwhile, back in the Northern District of Illinois, still on January 22, Chicago Rivet moved the district court in the instant action to dismiss MITE's challenge to the Illinois Act on the ground that no case or controversy existed between the parties. Chicago Rivet represented to the court that it had no present intention of invoking the Illinois Act, and Secretary of State Dixon represented that he had not decided whether MITE's offer should be exempt from the Act. Pursuant to those representations and by the consent of the parties, the district court ordered that neither Chicago Rivet nor Secretary Dixon would be allowed to initiate any action against MITE under the Illinois Act without first indicating a written intention to do so at least two business days before the proposed action was to be instituted. The district court further ordered that MITE's requests for injunctive relief were to be continued until further notice.

The following day, January 23, 1979, the action once more moved to Pennsylvania. MITE removed the action Chicago Rivet had filed in the Court of Common Pleas of Blair County to the United States District Court for the Western District of Pennsylvania, and on January 24 MITE filed its own complaint in the latter forum seeking to have the Pennsylvania Act declared unconstitutional and to have its enforcement by either Chicago Rivet or the Pennsylvania Securities Commission enjoined. Those two actions were consolidated by the federal district court in Pennsylvania.

On January 31, 1979, the Pennsylvania Securities Commission determined that it would not enforce the Pennsylvania Act against MITE's proposed tender offer, and on February 1 the District Court for the Western District of Pennsylvania denied Chicago Rivet's motion for a temporary restraining order. Apparently sensing that the tide of battle in Pennsylvania had turned, defendants then quickly moved to proceed again under the Illinois Act. On February 1, 1979, defendant Dixon issued a temporary cease and desist order and notice of hearing regarding the proposed tender offer. Dixon concluded that MITE was about to violate the Illinois Act by commencing its offer. He notified MITE that he intended to issue an order to it to "cease and desist all further action to make a tender offer" for Chicago Rivet. This order, together with the accompanying notice, was to be served on February 5.

On February 2, 1979, Chicago Rivet notified MITE by letter that it would file suit in the Circuit Court of Cook County, Illinois, to restrain the proposed tender offer because MITE was violating the Illinois Act.

In response to defendants' decisions to invoke the Illinois Act, MITE renewed its request for relief before the district court. Judge Crowley entered an order on February 2 preliminarily enjoining defendant Dixon from issuing a cease and desist order or notice of hearing, or from otherwise enforcing the Illinois Act against MITE. MITE then published its tender offer in the national edition of the *Wall Street Journal* on February 5. The tender offer, which represented a proposed transaction in interstate commerce in excess of $23,000,000, was made to all of the shareholders of Chicago Rivet residing throughout the

United States, including those residing in Illinois.

The district court entered its final judgment order in the instant action on February 9, 1979. The order declared the Illinois Act to be null and void because it was preempted by the Williams Act and because it created an undue burden on interstate commerce in violation of the commerce clause. The district court also permanently enjoined enforcement of the Illinois Act against MITE in connection with its proposed tender offer. From the judgment of the district court, defendant Dixon now appeals.

MITE withdrew its February 5, 1979 tender offer, and the record does not indicate whether MITE intends to make another tender offer for Chicago Rivet's shares. Nevertheless, if this court were to reverse the judgment of the district court, MITE would face both criminal and civil liability for making the February 5, 1979 offer in violation of the Illinois Act. *See* Illinois Rev.Stat. ch. 121½, §§ 137.63–137.65 (1979). Since the Secretary has indicated that he intends to enforce the Act against MITE, the issues before us are not moot.

## II. PREEMPTION

■ The determination whether a challenged state statute is void under the supremacy clause is notoriously complicated. "No simple formula can capture the complexities of this determination; the conflicts which may develop between state and federal action are as varied as the fields to which congressional action may apply." *Goldstein v. California*, 412 U.S. 546, 561, 93 S.Ct. 2303, 2312, 37 L.Ed.2d 163 (1973). Prior cases do not always furnish precise guidelines in resolving a particular controversy, "for each case turns on the peculiarities and special features of the federal regulatory scheme in question." *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 638, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547 (1973). Nonetheless, over the years the general tests to be applied in adjudicating questions of preemption have become reasonably well established. As the Fifth Circuit noted in *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1274 (1978), *rev'd on venue grounds sub nom. Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), those tests were summarized by the Supreme Court in *Jones v. Rath Packing Co.*, 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977):

> The first inquiry is whether Congress, pursuant to its power to regulate commerce, U.S.Const., Art. 1, § 8, has prohibited state regulation of the particular aspects of commerce involved in this case.... [W]hen Congress has "unmistakably ... ordained," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. This result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973); *Rice v. Santa Fe Elevator Corp.*, [331 U.S. 218,] 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 [1947].[3]

---

**3.** With respect to the possibility of implicit preemption, the Fifth Circuit observed in *Great Western United Corp. v. Kidwell, supra*, 577 F.2d at 1274, n.38, that

> In *Rice*, the [Supreme] Court discussed some circumstances that show an implicit Congressional desire to preempt all state regulation in a given field:
> The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the state to supplement it.... Or the Act of Congress

may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.... Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. *Rice v. Santa Fe Elevator Corp.*, 1947, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447. *Accord, Pennsylvania v. Nelson*, 1956, 350 U.S. 497, 502–05, 76 S.Ct. 477, 480, 100 L.Ed. 640.

Congressional enactments that do not exclude all state legislation in the same field nevertheless override state laws with which they conflict. U.S.Const., Art. VI. The criterion for determining whether state and federal laws are so inconsistent that the state law must give way is firmly established in our decisions. Our task is "to determine whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *Accord, De Canas v. Bica,* 424 U.S. 351, 363, 96 S.Ct. 933, 940, 47 L.Ed.2d 43 (1976); *Perez v. Campbell,* 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971); *Florida Lime & Avocado Growers, Inc. v. Paul, supra,* 373 U.S. at 141, 83 S.Ct. at 1216; *id.,* at 165, 83 S.Ct. at 1229 (White, J., dissenting). This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written. *See De Canas v. Bica, supra,* 424 U.S. at 363–365, 96 S.Ct. at 940; *Swift & Co. v. Wickham,* 230 F.Supp. 398, 408 (S.D.N.Y.1964), *appeal dismissed,* 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), *aff'd on further consideration,* 364 F.2d 241 (CA2 1966), *cert. denied,* 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967).

■ Congress has not chosen in the Securities Exchange Act of 1934 expressly to bar the states from regulating tender offers. Indeed, the Supreme Court has noted that § 28(a) of the 1934 Act[4] "was plainly intended to protect, rather than to limit, state authority." *Leroy v. Great Western United Corp., supra,* 443 U.S. at 182, 99 S.Ct. at 2716.[5] Nor is the federal scheme of regulating tender offers so pervasive that an implicit congressional intent to preempt parallel state legislation may fairly be inferred. As discussed *infra,* the Williams Act is essentially a minimum disclosure statute. It is not analogous, for example, to the detailed and comprehensive scheme of federal regulation of aircraft noise which led to a finding of preemption in *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973).[6]

■ Of course, even federal legislation that is not pervasive will preempt supplemental state enactments if Congress has legislated in an area of paramount federal importance. In the realms of national security and foreign affairs, state legislation has been held implicitly preempted because both areas are of unquestionably vital significance to the nation as a whole. *See Pennsylvania v. Nelson,* 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956) (national security); *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (foreign affairs). But federal securities regulation is not of equivalent paramountcy, as an area of federal concern, to the security of the nation or to the conduct of its international relations. On the contrary, the absence of an exclusive federal interest in the field of securities regulation is persuasively

---

4. Section 28(a), as set forth in 15 U.S.C. § 78bb(a) (1976), provides in pertinent part: Nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.

5. Section 28 was primarily designed, however, to preserve state Blue Sky laws. *Kidwell, supra,* 577 F.2d at 1275, n.39. *See* Langevoort, *State Tender–Offer Legislation: Interests, Effects, and Political Competency,* 62 Cornell L.Rev. 213, 247 (1977) (hereinafter "Langevoort").

6. *See* Langevoort, *supra* n.5, at 248. *But see* Wilner and Landy, *The Tender Trap: State Takeover Statutes and Their Constitutionality,* 45 Fordham L.Rev. 1, 29 (1976); Note, *Commerce Clause Limitations upon State Regulation of Tender Offers,* 47 S.Cal.L.Rev. 1133, 1163–66 (1974); Note, *The Effect of the New SEC Rules on the Constitutionality of State Takeover Statutes,* 8 Fordham Urb.L.J. 913, 930–31 (1979–80) (suggesting that the Williams Act constitutes a pervasive scheme of federal regulation if considered together with the new SEC tender offer rules, discussed *infra* ).

demonstrated by the historically coordinate role of state regulation in the field.[7]

Thus, in the absence of explicit or implicit preemption, our task is to determine whether the Illinois Act conflicts with the Williams Act, to ascertain "whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978); *Jones v. Rath Packing Co.*, 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977). *Accord, De Canas v. Bica*, 424 U.S. 351, 363, 96 S.Ct. 933, 940, 47 L.Ed.2d 43 (1976); *Perez v. Campbell*, 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141, 83 S.Ct. 1210, 1216, 10 L.Ed.2d 248; *id.*, at 165, 83 S.Ct. at 1229 (White, J., dissenting). A careful comparison of the terms of the Williams Act with the Illinois Act is accordingly requisite. *Cf. Perez v. Campbell*, 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971).

The Williams Act is a product of the economic boom of the 1960's. During that period of business growth and corporate acquisition by conglomerates and others, the cash tender offer first came into vogue as a favored method for corporate takeovers. *Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977). Passage of the Williams Act was designed to close the gap in the disclosure requirements of the federal securities laws by bringing cash tender offers, which theretofore stood virtually unregulated, within the ambit of federal securities regulation. *Id.*[8]

The dominant theme of the Williams Act is the protection of investors. *Piper v.* *Chris–Craft Industries, Inc., supra* at 29, 97 S.Ct. at 943. As the Supreme Court remarked in *Piper*:

> In introducing the [Williams Act] on the Senate floor, the sponsor, Senator Williams, stated:
>
> > "This legislation will close a significant gap in *investor protection* under the Federal securities laws by requiring the disclosure of pertinent information *to stockholders* when persons seek to obtain control of a corporation by a cash tender offer or through open market or privately negotiated purchases of securities." 113 Cong.Rec. 854 (1967) (emphasis supplied [by the Supreme Court].)

430 U.S. at 26, 97 S.Ct. at 942.

Investors are protected under the Williams Act through what has been termed a "market approach." "The function of federal regulation is to get information to the investor by allowing both the offeror and the incumbent managers of a target company to present fully their arguments and then *to let the investor decide for himself.*" *Kidwell, supra*, 577 F.2d at 1276 (emphasis supplied).

The principal disclosure provisions of the Williams Act are sections 13(d) and 14(d). 15 U.S.C. §§ 78m(d), 78n(d) (1976). Section 13(d) requires that a purchaser of any equity security registered pursuant to Section 12 of the 1934 Act file a Schedule 13D[9] with the SEC within 10 days after its purchases have exceeded 5% of the outstanding shares of the security. The Schedule 13D mandates disclosure, *inter alia*, of the background and identity of the purchaser, the source and amount of funds for the purchase, the number of shares owned and of any plans to materially alter the target corporation's business or corporate structure (if the intent of the purchases is to obtain control). Section 14(d), more imme-

---

**7.** "Congress, in the securities field, has not adopted a regulation system wholly apart from and exclusive of state regulation." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 137, 94 S.Ct. 383, 394, 38 L.Ed.2d 348 (1973).

**8.** *See generally* S.Rep.No.550, 90th Cong., 1st Sess. 2–4 (1967); H.R.Rep.No.1711, 90th Cong., 2d Sess., 2–4 (1968), U.S.Code Cong. & Admin. News 1968, p. 2811.

**9.** 17 C.F.R. § 240.13d–101 (1979).

diately relevant to the instant case, is designed to insure informed shareholder decisionmaking in the face of a tender offer by requiring that a tender offeror file a Schedule 14D–1[10] with the SEC and furnish to the target's shareholders all material information which it contains. The disclosures required in a Schedule 14D–1 are essentially similar to those required by a Schedule 13D.

The Williams Act also contains a number of substantive protections for stockholders who elect to tender their shares. First, tendering shareholders are given the right to withdraw their tender of stock within the first seven days of an offer and, if the offeror has not yet purchased their shares, at any time after 60 days from the date the offer commenced. 15 U.S.C. § 78n(d)(5) (1976).[11] Second, if the total number of shares tendered exceeds the number sought, those shares tendered during the first ten days of the offer must be taken up pro rata by the offeror. 15 U.S.C. § 78n(d)(6) (1976). Finally, if the initially offered consideration is later increased during the course of the offer, all tendering shareholders must receive the higher price. 15 U.S.C. § 78n(d)(7) (1976).

Turning to the Illinois Act, even the most cursory perusal reveals that it contains a number of provisions which are not to be found in the Williams Act. From the fact that the two statutes differ, MITE suggests at least by implication that a preemptive conflict must necessarily exist. That argument is simplistic; mere differences between state and federal regulation of the same subject are not conclusive of preemption. No one disputes that the two statutes differ. But the crucial inquiry is whether the Illinois Act differs from the Williams Act in such a way that achievement of the congressional objective of investor protection is frustrated. *Hines v. Davidowitz, supra.*

In this regard the most troublesome portion of the Illinois Act is a provision contained in the hearings section of the Act, § 137.57.E, which provides:

If the Secretary [of State] finds that the take–over offer fails to provide full and fair disclosure to the offerees of all material information concerning the take–over offer, *or that the take–over offer is inequitable* or would work or tend to work a fraud or deceit upon the offerees, or that the take–over offer will not be made to all offerees in this State on substantially equal terms, or that the take–over offer would violate this Act, the Secretary shall by order deny the registration of the take–over offer[12] or condition its registration upon certain changes or modifications. If the Secretary finds that the take–over offer provides full and fair disclosure to the offerees of all material information *concerning* the take–over offer, and that the take–over offer is made to all offerees in this state on substantially equal terms *and the Secretary does not find that the offer is inequitable* or would work or tend to work a fraud or deceit upon offerees in this State, or would violate this Act, the Secretary shall by order register the take–over offer. Registration of the take–over offer does not constitute approval of the offer by the Secretary (emphasis supplied).

Ill.Rev.Stat. ch. 121½ § 137.57.E (1979).

The Illinois Act thus empowers the Secretary of State to pass upon the substantive fairness of a tender offer and to prohibit it from going forward, if, in his sole opinion, he judges the offer "inequitable." Dixon defends this provision on the ground that "allowing for review by a neutral state administrator while the securityholders have time to consider the offer" will not result in unnecessary delay. Appellant's Brief at 17. This defense, however, is inad-

10. 17 C.F.R. § 240.14d–100 (1979).

11. The initial seven day withdrawal period contained in the Williams Act was recently extended to fifteen business days by the SEC. 17 C.F.R. § 240.14d–7 (1979).

12. Any person publishing an unregistered take–over offer is subject to criminal prosecution. Ill.Rev.Stat. ch. 121½, §§ 137.54, 137.63 (1979).

equate because it responds to the wrong challenge. Illinois' substitution of the judgment of its Secretary of State for an investor's own assessment of the equitability of a tender offer is patently inconsistent with the Williams Act, but not primarily because the state statutory process may unduly slow the progress of tender offers. Rather, this approach to investor protection by "benevolent bureaucracy" is preempted by the conflicting approach of the Williams Act, which contemplates unfettered choice by well–informed investors. Both the House and Senate Reports observed that "[t]his bill is designed to make the relevant facts known so that shareholders have a fair opportunity to make *their* decision." H.R. Rep. No. 1711, 90th Cong., 2d Sess. 3 (1968); S.Rep. No. 550, 90th Cong., 1st Sess. 3 (1967); [1968] U.S.Code Cong. & Admin. News at 2813 (emphasis supplied).[13]

The state thus offers investor protection at the expense of investor autonomy··an approach quite in conflict with that adopted by Congress. Congress contemplated only that investors be protected from acting in ignorance, not from their own well–informed choice. Thus, to the extent that Illinois has chosen to rely upon its Secretary of State's judgment rather than upon investors' own judgment after full disclosure of the relevant facts, its regulatory scheme stands in fundamental conflict with federal law and is therefore unconstitutional. *Cf. Kidwell, supra* at 1279.[14]

Because it potentially affords the target company's management a powerful weapon to stymie indefinitely a takeover, another provision of the Illinois Act relating to hearings is also unacceptable.[15] This provision forms an additional obstacle to the congressionally–mandated purpose that shareholders be free within a reasonable time [16] to accept a tender offer they deem fair (after full disclosure). Thus, Section 137.57.A provides:

The Secretary shall call a hearing if the Secretary deems it necessary for the protection of offerees in this State or if within 15 business days after the date of filing the registration statement a written request for a hearing is submitted to the Secretary, by a majority of the directors of the target company who are not officers or employees of the target company or by a person or persons who are located in this State as determined by post office address as shown on the records of the target company and who hold of record or beneficially, or both, at least 10% of the outstanding shares of any class of equity securities which is the subject of the take–over offer.

Ill.Rev.Stat. ch. 121½, § 137.57.A (1979).

Although Illinois apparently did not *intend* to accord incumbent management the right to require the holding of hearings, the effort to disarm management is not realistically assured of success. It still seems like-

---

**13.** Federal disclosure legislation employing a "market" approach does not necessarily preempt other state statutes incorporating a regulatory approach, e. g. Blue Sky laws. See note 5 *supra*; Langevoort, *supra* note 5 at 247. In this connection, our finding that the Illinois Act is preempted by the Williams Act finds support, *inter alia*, in the enactment of the Williams Act prior to the Illinois Act and in the extraterritorial impact of the Illinois Act. See part III *infra*.

**14.** When the Williams Act was under consideration, even the SEC did not suggest that it be granted the authority to weigh the substantive fairness of a tender offer. As then SEC Chairman Cohen stated:

We do not wish to imply . . . that the Commission should have power or responsibility to pass on the merits of a particular acquisition or proposal. As in most other areas entrusted to it, the Commission's responsibil-

ity should be limited to requiring appropriate disclosures.

*Hearings on S.510 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. 33 (1967). *See also* Securities and Exchange Commission, *The Work of the Securities and Exchange Commission* 2 (1974); Note, *The Indiana Business Takeover Act*, 51 Ind.L.J. 1051, 1096–97 (1976).

**15.** For a discussion of the objectives of maintaining a balance between the target company's management and the offeror in the context of investor protection, *see infra*.

**16.** The Act does not fix any time within which hearings must be completed. Presumably they might be extended indefinitely. Ill.Rev.Stat. ch. 121½, § 137.57 (1979).

ly that in a significant number of cases management will be able to use the provision, either through its ability to influence outside directors, or because it will, directly or indirectly, exercise some (or a great deal of) control over the required number of outstanding shares. Since the interests of the target company's management at the time of a tender offer are likely to be adverse to those of the offeror (and conceivably the shareholders),[17] anything which suggests delegation to management of the right to call hearings (of potentially indefinite duration) does not further the congressional goal of insuring freedom of action of informed stockholders. It may be acceptable in some way, and with appropriate justification, to require hearings on the request of persons other than a public official. But in general, any delegation of the right to call hearings to private parties potentially (but realistically) subject to management influence or direction must be regarded as suspect.[18]

The hearing provision, together with the Act's 20–day pre–effective filing requirement,[19] are also subject to more general attack on the ground that they may result in unacceptable delay (which, in the case of hearings, might be interminable). This delay will allegedly enhance incumbent management's ability to defeat a tender offer, to the detriment of investors. Two schools of thought have emerged with respect to the relationship among state takeover statutes as engines of delay, the possible inhibition or withdrawal of tender offers (primarily as a result of delay), and preemption under the Williams Act. On the one hand, most courts, including the Fifth Circuit in *Kidwell*, have reasoned along the following lines: the Williams Act was designed both to protect shareholders and to preserve a neutral balance between incumbent management and offeror. Because state takeover statutes hinder the successful completion of tender offers by providing management with a powerful weapon of delay, such statutes "[disrupt] the neutrality indispensable for the proper operation of the federal market approach," and therefore " '[stand] as ... obstacle[s] to the accomplishment and execution of the full purposes and objectives' of the Williams Act." *Kidwell, supra* at 1279–80.[20]

On the other hand, at least one court, and several commentators, have taken issue with the Fifth Circuit's approach.[21] They argue, citing the Supreme Court, that "the sole purpose of the Williams Act was the protection of investors...." *Piper v. Chris–Craft, supra*, 430 U.S. at 35, 97 S.Ct. at 946. Hence they reject the further contention that Congress sought to legislate affirmative regulatory neutrality between the combatants in a tender offer situation. In this conclusion, they rely, *inter alia*, on an observation of the Supreme Court in

---

**17.** *See* Note, *Securities Law and the Constitution: State Tender Offer Statutes Reconsidered*, 88 Yale L.J. 510, 531 (1979) (hereinafter *"Tender Offer Statutes Reconsidered"*).

**18.** We are, of course, addressing here only requests which would mandatorily trigger hearings. Mere precatory requests are quite distinguishable and, in and of themselves, acceptable.

**19.** Illinois Act § 137.54, which provides in pertinent part:

E. A take–over offer shall become registered [and thereby effective] 20 business days after the date of filing the registration statement or an amendment thereto with the Secretary, unless accelerated by order or delayed by written notification, or unless prior thereto the Secretary calls a hearing with respect to the offer.

Ill.Rev.Stat. ch. 121½, § 137.54.E (1979).

**20.** *Accord, Telco Marketing Services, Inc. v. Hospital Finance Corp.*, No. 79–C–2343 (N.D. Ill. June 11, 1979); *Brascan Ltd. v. Lassiter*, No. 79–1253 (E.D.La. May 3, 1979); *Dart Industries Inc. v. Conrad*, 462 F.Supp. 1 (S.D.Ind. 1978); *Daylin v. Uarco*, No. 78–C–4246 (N.D.Ill. Nov. 27, 1978). *See also*, Note, *The Indiana Business Takeover Act, supra* n.13, at 1092.

**21.** *See AMCA International Corp. v. Krouse*, 482 F.Supp. 929 (S.D.Ohio 1979); *cf. Telvest, Inc. v. Bradshaw*, 618 F.2d 1029 (4th Cir. 1980). *See also* Note, *Preemption and the Constitutionality of State Tender Offer Legislation*, 54 Notre Dame Law, 725, 734 ·35 (1979); Note, *The Constitutionality of State Takeover Statutes: A Response to Great Western*, 53 N.Y.U. L.Rev. 872, 914 15 (1978) (hereinafter *"A Response to Great Western"*).

*Piper,* that "Congress was indeed committed to a policy of neutrality in contests for control, but its policy of evenhandedness does not go ... to the purpose of the legislation.... Neutrality is, rather, but one characteristic of legislation directed toward a different purpose–the protection of investors." 430 U.S. at 29, 97 S.Ct. at 943. One commentator has summarized this position as follows:

> Any balance that emerged from the Williams Act was neither a "purpose" nor an "objective" of its draftsmen, but rather a byproduct of the congressional desire to "require full and fair disclosure for the benefit of investors." The fact that the state statutes may alter this balance is therefore an inappropriate basis for statutory preemption. Only if state regulation of tender offers conflicts with the true purpose and objective of the Williams Act–investor protection–should the state laws be held to be preempted (footnotes omitted).

*Tender Offer Statutes Reconsidered, supra* n.16, at 522–23.

**22.** The legislative history of the Williams Act is replete with references to the necessity of avoiding undue interference with tender offers (so as not to injure investors). The following interchange between Senators Javits and Williams on the Senate floor is particularly revealing.

> Mr. Javits. One other question I should like to ask the Senator: There is no intendment in the measure, or in the fact that the measure is offered, to in any way condemn the practice of making tenders, is there? Sometimes stockholders do very well because of tenders, especially competitive tenders.
>
> Mr. Williams of New Jersey. There is no intention in any way to prohibit tender offers. As a matter of fact, I think it might encourage them. Through this legislation people will have more information, and will be able to intelligently decide whether to accept a tender offer and sell their shares to a group which may wish to obtain a controlling interest.

113 Cong.Rec. 24665 (1967). Senator Javits also later remarked in the same discussion:

> I gather that the point of the Senator from New Jersey [Senator Williams] and the Senator from California [Senator Kuchel] is that this is at least a beginning in keeping up with getting adequate representation and adequate information on the part of the stockholder, who could conceivably be imposed

But the inadequacy in this point of view seems to lie in its implicit assumption that the "goals" of investor protection and evenhanded regulation are necessarily distinct and, to a significant degree, unrelated. It does not seem to us that they are. Rather, inhibitions on tipping the regulatory balance, particularly on tilting toward incumbent management, are important because maintenance of an equitable balance between the contending sides is perceived as a principal means of investor protection. For if the weapons in management's arsenal are drastically augmented, the vigor of the tender offer device will at some point be impaired, denying protection to stockholders in an obvious dimension: the right to tender their shares at a premium. Thus, in its concern for investors, Congress was necessarily committed to maintaining, where appropriate, the basic capability of offerors to make successful tender offers (as well as, of course, maintaining the free flow of information to stockholders both from offerors and from management).[22]

> upon, *without denying him the opportunities which result from the competitive bidding for a block of stock of a given company.*

113 Cong.Rec. 24665–66 (1967) (emphasis supplied).

> In a similar vein, Senator Williams observed on an earlier occasion that
>
> This measure is not aimed at obstructing legitimate takeover bids. In some instances, a change in management will prove a welcome boon for shareholder and employee, and in a few severe situations it may be necessary if the company is to survive.
>
> I have taken extreme care with this legislation to balance the scales equally to protect the legitimate interests of the corporation, management, and shareholders without unduly impeding cash takeover bids. Every effort has been made to avoid tipping the balance of regulatory burden in favor of management or in favor of the offeror. The purpose of this bill is to require full and fair disclosure for the benefit of stockholders while at the same time providing the offeror and management equal opportunity to fairly present their case....
>
> With this in mind, I am certain that this amendment to the Securities Exchange Act will benefit the interests of America's more than 20 million shareholders and will not serve as a device to protect an inefficient management from a legitimate takeover bid.

Turning again to the Illinois Act, any conclusion as to the actual effect it has had, or may have, on tender offers in Illinois would be purely speculative because the record is devoid of evidence on that subject. It is obvious from the face of the statute, however, that tender offers subject to the Act may proceed at a much slower pace than if they were regulated exclusively under the Williams Act. As indicated, the Illinois Act provides that a tender offer does not become effective until 20 business days after the offeror has filed a registration statement concerning the offer with the Secretary of State. *See* n.19, *supra.* By contrast, the Williams Act contains no such prenotification requirement. Indeed, Congress has repeatedly rejected proposals for prenotification requirements.[23]

The Illinois Act also prevents a tender offer from going forward until after completion of a hearing, in the likely event that one is requested. *See* pp. 494–495, *supra.* A request for a hearing need not be made until 15 business days after the offeror's registration statement has been filed, need not commence until 10 business days after the hearing request was received, and may last indefinitely. Ill.Rev.Stat. ch. 121½, § 137.-57 (1979). Once the hearing has been concluded, the Secretary of State is accorded an additional 15 business days to make a

decision, which he may extend. *Id.* By contrast, no hearings are contemplated or required under the Williams Act.

Extended delay potentially threatens the viability of the tender offer device in two related ways. First, if time is of the essence, delay increases the possibility that an offer, once made, will not be successfully completed. This is because delay eliminates the element of surprise, and affords incumbent management, whose jobs are likely to be imperiled, an opportunity to resort to a variety of defensive maneuvers to thwart the attempted takeover.[24] Second, the specter of delay may serve to dissuade potential offerors from initiating offers at all. *See Kidwell, supra* at 1278 (and sources cited therein).

Both of these propositions regarding delay have been the subject of lively debate in the literature. Delay has been said to benefit rather than injure investors, primarily by permitting the emergence of competitive suitors (and arbitrageurs), thereby creating an "auction market" in which the target's stockholders will ultimately receive a higher premium for their shares. *Tender Offer Statutes Reconsidered, supra* n.16, at 524. *See also A Response to Great Western, supra* n.20, at 901–02, 913. Arguably, stockholders may also benefit from the opportunity to weigh for an extended period an

113 Cong.Rec. 854–55 (1967).

**23.** In 1965, Congress rejected a proposed twenty–day prenotification requirement. *See* 111 Cong.Rec. 28257–28259 (1965). In 1967, Congress rejected a five–day prenotification requirement. S.Rep. No. 550, 90th Cong., 1st Sess. 4 (1967) U.S.Code Cong. & Admin.News 1968, p. 2811; *Hearings on S. 510 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency,* 90th Cong., 1st Sess. 72–75, 87–89, 98, 105, 139–40, 151, 163, 245 (1967); *Hearings on H.R. 14475 and S. 510 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce,* 90th Cong., 2d Sess. 44–46, 50–54 (1968). In 1970, Congress rejected yet another prenotification proposal. *See Hearings on H.R. 4285, S. 3431 and S. 336 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce,* 91st Cong., 2d Sess. 6–7 (1970).

A prenotification requirement is less defensible than required delays *after* a tender offer has

been made, because implementation of a successful defensive strategy by management before an offer becomes effective, *e. g.,* the arrangement of a defensive merger, might entirely deprive stockholders of the chance to sell their shares at a premium. *See infra. See also Tender Offer Statutes Reconsidered, supra* n.16, at 531–32. Moreover, a number of commentators have identified prenotification provisions as particularly detrimental to successful takeovers. *See, e. g.,* Langevoort, *supra* n.5, at 226–29.

**24.** Frequently employed defensive tactics include, *e. g.,* arranging a defensive merger, exhorting shareholders not to tender their shares, increasing dividends and abolishing cumulative voting. *See generally,* Schmults & Kelly, *Cash Take–over Bids–Defensive Tactics,* 23 Bus.Law. 115 (1967); Note, *Defensive Tactics Employed by Incumbent Managements in Contesting Tender Offers,* 21 Stan.L.Rev. 1104 (1969).

offer as to which there might otherwise be a requirement to promptly tender their shares. *Tender Offer Statutes Reconsidered, supra* n.16, at 524. Moreover, as an empirical matter, despite the proliferation of state takeover statutes, there is no clear indication that those endeavoring to obtain corporate control have curtailed their use of the tender offer mechanism. *See AMCA International Corp. v. Krouse,* 482 F.Supp. 929 (S.D.Ohio 1979); *Tender Offer Statutes Reconsidered, supra* n.16, at 523; *A Response to Great Western, supra* n.20, at 902–03, 913.

· As indicated, however, there is no evidence in the record about what the actual effect of the potential for delay, inherent in the Illinois Act, has been. In the absence of such evidence, we ought not to second guess Congress' judgment that delay grossly in excess of that contemplated by the Williams Act redounds to the detriment of stockholders by substantially deterring the making of tender offers. As the Fifth Circuit noted in *Kidwell,* that assessment was reaffirmed by Congress during consideration of the Hart–Scott–Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a (1976).

The House Report stated

> it is clear that this short waiting period [referring to the 10 days required by the Williams Act] was founded on congressional concern that a longer delay might unduly favor the target firm's incumbent management and permit them to frustrate many pro–competitive cash tenders. This 10–day waiting period, thus underscores the basic purpose of the Williams Act–to maintain a neutral policy toward cash tender offers, by avoiding lengthy delay that might discourage their chances for success.

H.R.Rep. No. 94–1373, 94th Cong., 2d Sess. 12 (1976); U.S.Code Cong. & Admin. News 1976, pp. 2572, 2644. Congressman Rodino explained to the House:

> Lengthy delays will give the target firm plenty of time to defeat the offer, by abolishing cumulative voting, arranging a speedy defensive merger, quickly incorporating in a State with an antitakeover statute, or negotiating costly lifetime employment contracts for incumbent management. And the longer the waiting period, the more the target's stock may be bid up in the market, making the offer more costly–and less successful. Should this happen, it will mean that shareholders of the target firm will be effectively deprived of the choice that cash tender offers give to them.... *Generally, the courts have construed the Williams Act so as to maintain these two options for the target company's shareholders, and the House conferees contemplate that the courts will continue to do so.*

122 Cong.Rec. 30877 (1976) (emphasis added [by the Fifth Circuit]).

*Kidwell, supra* at 1277–78.

We therefore conclude, purely in light of the congressional judgment and analysis, that tender offers may not be unduly hindered (by grossly extended delay under state law) to the detriment of investors. We reiterate that we possess no independent insight, based on evidence or research, about what the effect of slight or interminable delay may be. But we think the perspectives informing congressional legislation are reasonably clear and are binding upon us. Therefore, we conclude that the Illinois Act is preempted by the Williams Act because the former (1) tends inordinately to substitute regulatory control for investor autonomy, (2) provides for hearings the institution of which may be indirectly delegated to incumbent management and which are potentially interminable in length, (3) provides for other delays and mechanisms for delay which are potentially grossly in excess of the delay mandated by Congress and deemed by Congress to be appropriate to the protection of investors and (4) provides for lengthy prenotification

delay, a requirement Congress specifically rejected.[25]

## III. THE COMMERCE CLAUSE

The commerce clause provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce . . . among the several States . . . ." U.S. Const., Art. I, § 8, cl. 3. "Although the Clause thus speaks in terms of powers bestowed upon Congress, the [Supreme] Court long has recognized that it also limits the power of the States to erect barriers against interstate trade." *Lewis v.*

*BT Investment Managers, Inc.,* —— U.S. ——, ——, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). It remains true, however,

that much state legislation, designed to serve legitimate state interests and applied without discrimination against interstate commerce, does not violate the Commerce Clause even though it affects commerce. . . . "[I]n areas where activities of legitimate local concern overlap with the national interests expressed by the Commerce Clause–where local and national powers are concurrent–the Court

**25.** The Illinois Act also differs from the Williams Act in certain other particulars. The Illinois Act requires somewhat more extensive disclosure by an offeror than does the Williams Act, and the Illinois Act requires that acceptances of a partial offer be pro rated for the entire period of the offer, whereas the Williams Act requires proration only of those acceptances made during an offer's initial ten days, although that ten day period may be extended by the offeror. *Cf.* Ill.Rev.Stat. ch. 121½, §§ 137.54 and 137.59.D (1976) with 15 U.S.C. § 78n(d) (1976) and 17 C.F.R. § 240.14d–8 (1979). (The Illinois Act also grants to stockholders a longer period to withdraw their tenders than originally provided for in the Williams Act (17 calendar days v. 7 days), *cf.* Ill.Rev.Stat. ch. 121½, § 137.59.C (1979) with 15 U.S.C. § 78n(d)(5) (1976), but this requirement does not differ markedly from the 15 business day requirement contained in the new SEC tender offer rules, 17 C.F.R. § 240.14d–7 (1979), discussed below. Similarly, the Illinois Act's 20 calendar day minimum offering period, Ill.Rev.Stat. ch. 121½, § 137.59.B (1979), is almost identical to the 20 business day period prescribed by the SEC. 17 C.F.R. § 240.14e–1 (1979)). Aside from the extent to which these differing requirements of the Illinois Act may exhibit the constitutional infirmities discussed *supra*, we express no opinion as to whether the Williams Act preempts them.

We also take note that, on December 6, 1979, the SEC promulgated new rules governing tender offers. 17 C.F.R. § 240–14d–1 *et seq.* (1979). Those rules, most glaringly Rule 14d–2(b), directly conflict with the Illinois Act. As the SEC observed:

Under Rule 14d–2(b) a bidder's public announcement through a press release, newspaper advertisement or public statement of certain material terms of a cash tender offer causes the bidder's tender offer to commence under Section 14(d) of the [1934] Act. . . .

Some commentators noted that there is a direct conflict between Rule 14d–2(b) and state anti–takeover statutes with the effect that such statutes are preempted. These

statutes typically require a publication of or a public filing which includes the material terms of the tender offer prior to the time the offer may be commenced. [The Illinois Act requires a public filing at least 20 days prior to the time an offer may begin. *See* n.17, *supra*.] These requirements of the state statutes will trigger the commencement of the tender offer under Rule 14d–2(b) despite the fact that the state statutes do not permit the offer to commence until the conclusion of any applicable waiting period and hearing process. Moreover, by deeming commencement to occur on the date of the publication or filing required by these statutes, the minimum periods, best price, and withdrawal and pro rata rights provided under these statutes could not function since they are usually predicated on the effective date of the tender offer which cannot occur until after the conclusion of the waiting period and hearing process.

Thus, the conflict between Rule 14d–2(b) and such state statutes is so direct and substantial as to make it impossible to comply with both sets of requirements as they presently exist. While recognizing its long and beneficial partnership with the states in the regulation of securities transactions, the Commission nevertheless believes that the state takeover statutes presently in effect frustrate the operation and purposes of the Williams Act and that, based upon the abuses in current tender offer practice discussed above, Rule 14d–2(b) is necessary for the protection of investors and to achieve the purposes of the Williams Act (footnotes omitted).

44 Fed.Reg. 70329–30 (1979).

Our finding of preemption in the instant case, however, does not rely on the new SEC rules, because those rules do not apply to tender offers made prior to their effective date, as is the case with the tender offer here. 44 Fed. Reg. 70326 (1979). *Cf. AMCA International Corp. v. Krouse*, 482 F.Supp. 929, 933–34, n.4 (S.D.Ohio 1979).

in the absence of congressional guidance is called upon to make 'delicate adjustment of the conflicting state and federal claims,' *H. P. Hood & Sons, Inc. v. Du Mond,* [336 U.S. 525, 553, 69 S.Ct. 657, 679, 93 L.Ed. 865 (1949)] (Black, J., dissenting) . . .." *Great A & P Tea Co. v. Cottrell,* [424 U.S. 366, 371, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976)]; see *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977).[26]

*Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978).

The test to be applied in making the "delicate adjustment" of state and federal claims is set forth in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

Where the statute regulates even–handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 815, 4 L.Ed.2d 852. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Accord, Lewis v. BT Investment Managers, Inc., supra* 100 S.Ct. at 2015–16; *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); *Raymond Motor Transportation, Inc. v. Rice, supra,* 434 U.S. at 441–42, 98 S.Ct. 794; *Great A & P Tea Co. v. Cottrell,* 424 U.S. 366, 371–72, 96 S.Ct. 923, 927, 47 L.Ed.2d 55 (1976); *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960). Also relevant is the Supreme Court's statement in *Hughes v. Oklahoma, supra,* 441 U.S. at 336, 99 S.Ct. at 1736, that "when considering the purpose of a challenged statute, this Court is not bound by '[t]he name, description, or characterization given it by the legislature [or] the courts of the State,' but will determine for itself the practical impact of the law. *Lacoste v. Louisiana Dept. of Conservation,* 263 U.S. 545, 550, 44 S.Ct. 186, 188, 68 L.Ed. 437 (1924) . . .."

Dixon maintains that the state sought to further two legitimate local interests through enactment of the Illinois Act. First, Illinois assertedly acted to protect resident security holders, primarily by insuring that they possess adequate time and information to review the merits of a tender offer before deciding whether to tender their shares. Protecting resident investors is indisputably a legitimate state objective. Yet, as set forth above, the Williams Act itself protects investors by requiring disclosure, withdrawal rights, pro rata purchases and equal consideration for all shares taken up. Therefore, the benefit of the Illinois Act is limited to the marginal increase in information, time and other benefits that Illinois shareholders may gain as a result of the Act's operation. But, as we noted in the context of preemption, the potentially prolonged delay required by the Act may, in some circumstances at least, be detrimental to the interests of the shareholders. It has also been argued (with respect to a state's interest in its own investors) that additional disclosures, rather than allowing shareholders to make a more informed decision, may actually serve to confuse them and to obscure relevant information. *See Kidwell, supra* at 1280–81 (and sources cited therein). Thus, the benefits flowing to Illinois shareholders from the Act are, to a significant degree, speculative.

And, of course, the strength of the state's interest varies with the number of share-

---

**26.** Congress may, if it chooses, affirmatively authorize state regulation that would otherwise contravene the commerce clause. *See, e. g., Southern Pacific Co. v. Arizona,* 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945). In the instant case, defendant Dixon has not argued that Congress has consented to state takeover statutes without regard to their impact upon interstate commerce. *Cf. Kidwell, supra* at 1281–82.

holders that are Illinois residents. In this case, some 27% of Chicago Rivet's shareholders, holding approximately 43% of Rivet's outstanding shares, were Illinois residents. It is fortuitous that this relatively substantial number lived in Illinois. The Act would have applied even if none of Rivet's shareholders were Illinois residents and all the stock sales had occurred elsewhere, since the Act reaches every tender offer made for any corporation that meets, *inter alia,* two of the following conditions:

    (a) has its principal executive office in [Illinois];

    (b) is organized under the laws of [Illinois];

    (c) has at least 10% of its stated capital and paid–in surplus represented in [Illinois].

Ill.Rev.Stat. ch. 121½, § 137.52–10 (1979). Thus, the Act grants jurisdiction to the Secretary of State over tender offers that would not affect a single Illinois shareholder.[27]

The second interest Dixon asserts on the state's behalf is an interest in regulating the internal affairs of a corporation incorporated under Illinois law. A tender offer is argued to be functionally equivalent to a variety of other methods designed to effect changes in corporate control, *e. g.,* proxy contests and mergers, which have tradition-

ally been subject to regulation by the state of incorporation. *See* Shipman, *Some Thoughts About the Role of State Takeover Legislation:* ˙*The Ohio Takeover Act,* 21 Case W.Res.L.Rev. 722, 741–45 (1970); *A Response to Great Western, supra* n.19, at 931–34.

The contention that sales of securities made pursuant to a tender offer are properly analyzed (as "internal affairs") in terms of their cumulative potential to shift control of a corporation, rather than simply as sales of stock from one investor to another, is another proposition which has been extensively debated in the literature.[28] But assuming *arguendo* that a state has an interest in regulating transfers of control of locally incorporated corporations, defendant has not set forth any specific interest that Illinois has in asserting regulatory authority over the tender offer *in this case.* There is no reason to believe that Illinois' interest in regulating shifts in control, as affected here, is especially weighty. The state has not argued, for example, that MITE was intent on looting Chicago Rivet to the detriment of state interests.[29] We also note that, although the instant tender offer was made for an Illinois corporation, the Illinois Act applies, *inter alia,* to tender offers for any corporation of which 10% of the out-

**27.** The Act also applies to tender offers made for corporations for which 10% of the outstanding shares are held by Illinois residents. Ill.Rev.Stat. ch. 121½, § 137.52–10 (1979).

**28.** *Cf., e. g.,* Shipman, *Some Thoughts About the Role of State Takeover Legislation: The Ohio Takeover Act,* 21 Case W.Res.L.Rev. 722, 741–45 (1970); *A Response to Great Western, supra* n.19, at 931–34 (both arguing that a tender offer is an internal corporate transaction) with Wilner and Landy, *The Tender Trap: State Takeover Statutes and Their Constitutionality,* 45 Fordham L.Rev. 1, 16–17 and Note, *Commerce Clause Limitations upon State Regulation of Tender Offers,* 47 S.Cal.L.Rev. 1133, 1153–55 (1974) (suggesting that a tender offer is merely the aggregate of numerous individual sales of securities). The Fifth Circuit has concluded that a tender offer is not properly classifiable under the internal affairs doctrine. *Kidwell, supra* at 1280, n.53.

**29.** Since Chicago Rivet is an Illinois corporation, the instant case does not directly raise the

question whether a state not the state of incorporation has a valid interest in transfers of control (through tender offers for stock). The Illinois Act, for example, seems to be based on the assumption that the state has a recognizable interest in transfers of control if substantial assets and/or the corporation's principal place of business is located in Illinois. *See generally* Shipman, *Some Thoughts About the Role of State Takeover Legislation: The Ohio Takeover Act,* 21 Case W.Res.L.Rev. 722, 751–55 (1970); *A Response to Great Western, supra* n.20 at 934 39.

As a practical matter, the state wherein employees or operations are located may have a greater interest in transfer of control (presumably under the "internal affairs" doctrine) than the state of incorporation (if these states are not the same). These possibly disparate bases for local regulation of control transfers do, however, threaten to impair the certainty and uniformity of regulation.

standing class of equity securities is held by Illinois residents. Ill.Rev.Stat. ch. 121½, § 137.52–10 (1979). Thus, the Act applies to corporations that are incorporated in another state and have their principal place of business outside of Illinois. Illinois clearly has no interest in regulating the internal affairs of such corporations.

Having generally identified the weight and nature of Illinois' regulatory concerns, we must now examine the burden imposed by the Illinois Act on interstate commerce. The impact of the Act on the sale of securities in interstate commerce is in many respects at least potentially weighty. The Act's most obvious burdens result from its global impact. Once the Act has been invoked, all purchases, or offers to purchase by the offeror, of the target company's stock pursuant to a tender offer may be halted, including transactions to be executed entirely outside the boundaries of Illinois. The Illinois Act thus possesses a significant potential to cause commercial disruption.[30] For example, had the Secretary of State not been enjoined from going forward in the instant case, over 23 million dollars of interstate commerce would presumably have been affected. Illinois law would have determined when, if ever, purchases of, or offers to purchase, securities would be permitted under a tender offer. Moreover, the disruptive effects of the Illinois Act could be duplicated by other states seeking simultaneously to assert jurisdiction over a tender offer. In the case at bar, Chicago Rivet argued at various times that both the Illinois and Pennsylvania Acts applied to MITE's proposed tender offer. Where a number of states on various bases claim authority over a tender offer, any single state would have effective veto power over the offer even if it received the enthusiastic endorsement of all the other states.[31]

We think that Illinois' tenuous interest in protecting resident shareholders and regulating control transfers cannot constitutionally justify the Illinois Act's burdensome impact on free–flowing commerce. The Illinois Act's primary burden, interference with securities transactions throughout the nation, inheres in the Act itself and seems relatively concrete, whereas the local impact of changes in corporate control, and the actual protection investors may receive through additional disclosure and delay, are often, as in the case before us, quite speculative. Indeed, as we noted in the context of preemption, in some instances at least, grossly prolonged delay may redound to the stockholders' detriment. Thus, because it substantially obstructs interstate commerce, without countervailing local benefit, the Illinois Act violates the commerce clause, and is therefore unconstitutional.

## IV. CONCLUSION

Try as we may, we have been unable to square the Illinois Act with the Williams Act and with the constitutional prohibition against burdens on interstate commerce. We do not believe that all state legislation in this field, which imposes requirements going beyond the Williams Act, is unconsti-

---

**30.** *See, e. g.,* Wilner and Landy, *The Tender Trap: State Takeover Statutes and Their Constitutionality,* 45 Fordham L.Rev. 1, 19–21 (1976).

**31.** This criticism is somewhat muted with respect to the Illinois Act because of the Act's comity provision, Ill.Rev.Stat. ch. 121½, § 137.-53 (1979), which provides:

The registration and filing requirements of ... this Act shall not apply to a take–over offer if the Secretary has determined that another jurisdiction has, or other jurisdictions have, statutes or rules, which are applicable and are being applied and which afford protection to securityholders located in this State substantially equal to that afforded such securityholders by this Act.

State takeover statutes have also been said to burden interstate commerce by preventing the removal of local business out of state. *See Kidwell, supra,* at 1282. Dixon denies that the Illinois Act was intended to have such an effect, and MITE has not argued that the Act is so economically protectionist as to be illegal *per se. Cf. Philadelphia v. New Jersey,* 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2617, 57 L.Ed.2d 475 (1978); *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 145, 90 S.Ct. 844, 849, 25 L.Ed.2d 174 (1970). There is no evidence in the record as to what the actual effect of the Act in this regard has been.

tutional merely because it is different. But we simply are of the view that state legislation must conform, *inter alia,* to the Congressional premise that too long extended delay may operate to discourage offers. We are of the further view that the Illinois Act burdens interstate commerce in a manner which is substantial, clear and present, and which is not offset by the speculative protection afforded local shareholders or the state's interest in regulating control changes, which have, at least as argued here, only prospective and uncertain impact. It may very well be possible to draft state takeover legislation to supplement (rather than to contradict) the Williams Act and the congressional *premises and purposes which it incorporates.* Although the new SEC tender offer rules may provide crucial constraints, we perceive no inherent reason why the Williams Act may not be validly complemented and investor protection furthered by state legislation. Suffice to say that under the instant circumstances, Illinois had not succeeded in enacting such an unexceptionable statute.

The judgment is therefore

Affirmed.