## CRANE CO.

### v.

Robert M. LAM, Commissioner, Pennsylvania Securities Commissioner; Cole B. Price, Jr., Commissioner, Pennsylvania Securities Commission; Frank A. Ursomarso, Commissioner, Pennsylvania Securities Commission; Leroy S. Zimmerman, Attorney General of the Commonwealth of Pennsylvania; and Harsco Corporation.

### Civ. A. No. 81–287.

United States District Court,
E. D. Pennsylvania.

Feb. 12, 1981.

Franklin Poul, Philadelphia, Pa., for plaintiff.

Patrick T. Ryan, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION

BECHTLE, District Judge.

By Order of February 4, 1981, this Court preliminarily enjoined the enforcement of the Pennsylvania Takeover Disclosure Law, Pa.Stat.Ann., tit. 70, §§ 71–85 (Purdon Supp. 1980–1981) ("Pennsylvania Act"), in respect to the plaintiff corporation's tender offer for shares of the defendant corporation's common stock. This memorandum is in support of that Order.

## I. *Statement of the Case*

Plaintiff Crane Company ("Crane") is a publicly held corporation, incorporated in Illinois, with its principal place of business at New York, New York. Crane's securities are registered with the Securities Exchange Commission ("SEC") pursuant to § 12 of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* ("Exchange Act").

Defendants Robert M. Lam, Cole B. Price, Jr., and Frank A. Ursomarso are Commissioners of the Pennsylvania Securities Commission (collectively, "Pennsylvania Commission"), an agency of the Commonwealth of Pennsylvania organized under the Pennsylvania Securities Act of 1972, Pa. Stat.Ann., tit. 70, §§ 1–601 to 610 (Purdon Supp. 1980–1981). The Pennsylvania Commission is charged with the administration and enforcement of the Pennsylvania Act. *See* Pa.Stat.Ann., tit. 70, § 79 (Purdon Supp. 1980–1981).

Defendant Leroy S. Zimmerman is the Attorney General of the Commonwealth of Pennsylvania. Pursuant to § 12 of the Pennsylvania Act, upon request of the Commission, the Attorney General is empowered to enforce the Pennsylvania Act in certain respects. 70 Pa.Stat.Ann., tit. 70, § 82 (Purdon Supp. 1980–1981).

Finally, defendant Harsco Corporation ("Harsco") is a Delaware corporation with its principal place of business at Camp Hill, Pennsylvania. Harsco also has substantial assets in Pennsylvania. Harsco's common stock is registered with the SEC pursuant to § 12 of the Exchange Act and is publicly traded. As of December 11, 1979, Harsco had approximately 10,077,144 shares of common stock, held by 12,815 shareholders of record who are located throughout the United States. Seventeen percent—or 2,132—of Harsco's shareholders are residents of Pennsylvania.

On January 26, 1981, Crane's Board of Directors voted to commence a cash tender offer for up to 1,600,000 shares of Harsco's common stock, at a price of $38 per share. Shortly thereafter, on the same day, Crane issued a press release announcing its intention to make the tender offer and stating the offer's principal terms.

Since the tender offer involves the use of means and instrumentalities of interstate commerce and since Harsco's common stock is registered under § 12 of the Exchange Act, Crane's tender offer is subject to the tender offer provisions of the Exchange Act, 15 U.S.C. §§ 78n(d), (e) ("Williams Act"), and the regulations promulgated thereunder by the SEC. *See* 15 U.S.C. § 78n(d)(1). The Williams Act requires the disclosure of certain information, imposes substantive restrictions and includes a general anti-fraud provision. It also confers broad rule-making authority upon the SEC. In particular, SEC Rule 14d–2(b), promulgated under the Williams Act, requires an offeror to commence or withdraw the tender offer within five business days of the first public announcement of the tender offer. 17 C.F.R. § 240.14d–2(b). As the Court of Appeals for the Third Circuit explained:

> The commencement of the offer is the time at which an offeror is required to disseminate to shareholders the material information regarding the offer that the federal securities laws require. An offeror must file a disclosure statement on schedule 14D–1 with the [SEC], and must take certain additional steps to effect actual receipt by the shareholders of material information relating to the offer, the companies involved in the offer, and the terms of the offer. The federal policy underlying these requirements is to insure the prompt dissemination of all material information after the first public announcement. The information is necessary because the announcement of the offer itself will precipitate significant market activity in the securities of the target company, thus confronting public investors with an immediate need to make investment decisions. *See* SEC Release No. 34–16384, 44 Fed.Reg. 70326, 70329 n.15 (1979).

*Kennecott Corp. v. Smith,* 637 F.2d 181 [Current] CCH Fed.Sec.L.Rep. ¶ 97,731 at 98,829, 98,830 to 98,831 (3d Cir. 1980).

Crane's tender offer, however, is also subject to the requirements of the Pennsylva-

nia Act. *See* Pa.Stat.Ann., tit. 70, § 73 (Purdon Supp. 1980–1981) (definition of "Target company"). The Pennsylvania Act also requires disclosure of information regarding the tender offer, imposes substantive restrictions and prohibits fraud. Several of these provisions are similar or identical to the provisions of the Williams Act. However, of greatest importance at the present stage of this litigation, are two sets of provisions: (1) those which require an offeror to provide notice of the offer to the Pennsylvania Commission and the target company and to delay commencement of the offer for 20 days thereafter; and, (2) those which authorize the Pennsylvania Commission to delay or interrupt a tender offer by issuing a cease and desist order or by scheduling a hearing.

To be specific, the pre-commencement waiting period provisions make it unlawful for any offeror to make a tender offer:

> unless at least *20 days prior thereto* such offeror (i) files with the commission a registration statement containing the information prescribed by section 5, (ii) sends a copy of the registration statement by certified mail to the target company at its principal office and to the collective bargaining representative, if any, of the employees employed at the principal place of business of the target company and (iii) publicly discloses the offering price of the proposed offer and the fact that a registration statement has been filed with the commission which contains substantial additional information about the proposed offer, which registration statement is available for inspection at the commission's principal office during business hours.

Pa.Stat.Ann., tit. 70, § 74(a) (Purdon Supp. 1980–1981) (emphasis added). As to the possibility of hearings before the Pennsylvania Commission, the Pennsylvania Act provides:

> (d) A takeover offer automatically becomes effective 20 days after the date of filing the registration statement with the commission *unless delayed by order of the commission* or *unless prior thereto, the commission schedules a hearing with respect to the offer.* The commission may schedule a hearing, on its own initiative or at the request of the target company, if the commission has reason to believe that the takeover offer fails to provide full and fair disclosure to offerees of all material information concerning the offer, or is in violation of this act or the act of December 5, 1972 (P.L. 1280, No. 284), referred to as the "Pennsylvania Securities Act of 1972." If a hearing is scheduled, the offer shall not become effective until registered by order of the commission. Registration is not deemed to be approval of the offer by the commission and any representation to the contrary is unlawful.

*Id.* at § 74(d) (emphasis added). The hearing, if called, must commence within 30 days of the offer's registration, and a decision must be reached within 30 days of the hearing's conclusion. *Id.* at § 74(e).

In light of the apparent conflicts between the Williams Act and the Pennsylvania Act, Crane brought this action, on the same day it announced the tender offer, seeking (1) a declaratory judgment that the Pennsylvania Act is unconstitutional, alleging both that it conflicts with and is preempted by federal law and that it imposes an excessive burden on interstate commerce;[1] and, (2) preliminary and permanent injunctive relief restraining enforcement of the Pennsylvania Act against Crane's tender offer. In addition, on the same day Crane filed its complaint, Crane applied for and obtained a temporary restraining order from this Court restraining the defendants from enforcing the Pennsylvania Act pending the Court's hearing on Crane's motion for a preliminary injunction and prohibiting de-

---

1. In a third count, Crane also alleges that the Pennsylvania Act unconstitutionally infringes upon Crane's First Amendment rights to disseminate commercial speech. *See Kennecott Corp. v. Smith, supra,* 637 F.2d 181 [Current]

CCH Fed.Sec.L.Rep. ¶ 97,731 at 98,837 n.10. Since Crane's challenges under the Supremacy Clause and the Commerce Clause are dispositive here, the Court leaves resolution of Crane's First Amendment claim to another day.

fendants from commencing other litigation on the validity of the Pennsylvania Act.

On February 3, 1981, this Court held a hearing on Crane's motion for a preliminary injunction. Upon consideration of the hearing memoranda and the arguments of counsel, and in light of the developing case law both within and without this circuit, the Court granted plaintiff's motion and entered a preliminary injunction by Order dated February 4, 1981.

## II. *The Request for a Preliminary Injunction*

As the Court of Appeals for the Third Circuit recently reiterated:

> To obtain a preliminary injunction, the moving party must show (1) a reasonable probability of eventual success in the litigation, and (2) that irreparable injury will ensue if relief is not granted. In addition, the court may consider (3) the possibility of harm to other interested persons from the grant or denial of relief, and (4) the public interest.

*Kennecott Corp. v. Smith,* 637 F.2d 181 [Current] CCH Fed.Sec.L.Rep. ¶ 97,731, at 98,829, 98,834 (3d Cir. 1980). The Court now turns to the consideration of this case in light of these factors.

### (A) *Probability of Success on the Merits*

#### (1) *Preemption*

The Supremacy Clause of the United States Constitution provides that federal law, as the "supreme Law of the Land," shall preempt conflicting state law. U.S. Const. Art. VI, cl. 2. The tests for determining whether federal law preempts state law in a particular instance were summarized in *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977):

> The first inquiry is whether Congress, pursuant to its power to regulate commerce, U.S.Const., Art. 1, § 8, has prohibited state regulation of the particular aspects of commerce involved in this case. Where ... the field which Congress is said to have pre-empted has been traditionally occupied by the States, see, *e. g.,* U.S.Const., Art. I, § 10; *Patapsco Guano*

*Co. v. North Carolina,* 171 U.S. 345, 358 [18 S.Ct. 862, 867, 43 L.Ed. 191] (1898), "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947).... But when Congress has "unmistakably ... ordained," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. This result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 633 [93 S.Ct. 1854, 1859, 36 L.Ed.2d 547] (1973); *Rice v. Santa Fe Elevator Corp., supra* [331 U.S.] at 230 [67 S.Ct. at 1146].

Congressional enactments that do not exclude all state legislation in the same field nevertheless override state laws with which they conflict. U.S.Const., Art. VI. The criterion for determining whether state and federal laws are so inconsistent that the state law must give way is firmly established in our decisions. Our task is "to determine whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941). Accord, *De Canas v. Bica,* 424 U.S. 351, 363 [96 S.Ct. 933, 940, 47 L.Ed.2d 43] (1976); *Perez v. Campbell,* 402 U.S. 637, 649 [91 S.Ct. 1704, 1711, 29 L.Ed.2d 233] (1971); *Florida Lime & Avocado Growers, Inc. v. Paul, supra* [373 U.S.] at 141 [83 S.Ct. at 1217] *id.,* at 165 [83 S.Ct. at 1229] (White, J., dissenting). This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are writ-

ten. See *De Canas v. Bica, supra,* at 363–365 [96 S.Ct. at 940–41]; *Swift & Co. v. Wickham,* 230 F.Supp. 398, 408 (SDNY 1964), appeal dismissed, 382 U.S. 111 [86 S.Ct. 258, 15 L.Ed.2d 194] (1965), aff'd on further consideration, 364 F.2d 241 (CA2 1966), cert. denied, 385 U.S. 1036 [87 S.Ct. 776, 17 L.Ed.2d 683] (1967).

*Jones v. Rath Packing Co., supra,* 430 U.S. at 525–526, 97 S.Ct. at 1309–10.

Crane has shown a reasonable likelihood of success on the merits of its claim that the Williams Act, and the regulations promulgated thereunder, preempt the Pennsylvania Act. First, Crane argues that the Pennsylvania Act's requirement, that an offeror *wait* 20 days after publicly announcing its tender offer before commencing the offer, is preempted by SEC Rule 14d–2(b)'s requirement that the offeror *commence* the offer within five days of the offer's public announcement. All parties agree that the Third Circuit's recent decision in *Kennecott Corp. v. Smith, supra,* controls the disposition of this claim. In *Kennecott,* the Third Circuit held that a corporation making a tender offer was entitled to a preliminary injunction restraining the enforcement of New Jersey's takeover law which, like the Pennsylvania Act, prohibited the offeror from commencing its tender offer until at least 20 days after the announcement. Since it was not possible to comply with both SEC Rule 14d–2(b) and such a provision, the *Kennecott* court held that the offeror had shown a reasonable likelihood of success on his preemption claim. *Kennecott Corp. v. Smith, supra,* 637 F.2d 181 [Current] CCH Fed.Sec.L.Rep. ¶ 97,731, at 98,-835. *See also Canadian Pacific Enterprises (U.S.) Inc. v. Krouse,* 506 F.Supp. 1192 (S.D. Ohio 1981) (holding that SEC Rule 14d–2(b) preempts Ohio's waiting period provision and that SEC Rule 14d–2(b) was validly promulgated). As the Supreme Court has observed, "[a] holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce...." *Florida Avocado Growers, Inc. v. Paul,* 373

U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248. (citations omitted).

Defendants have thus conceded that *Kennecott* compels this Court to hold that SEC Rule 14d–2(b) preempts the Pennsylvania Act's 20-day waiting period. Memorandum of Defendant Harsco Corporation to Plaintiff's Motion for Preliminary Injunction, at 13–14 ["Defendant's Memorandum"]. Defendants disagree, however, with plaintiff's second contention that "[t]he waiting period *and hearing provisions* of the Pennsylvania Act conflict with the methods and objectives of the Williams Act and are thus preempted." Memorandum of Plaintiff in Support of its Application for a Temporary Restraining Order and Preliminary Injunction, at 4 (emphasis added). On the contrary, defendants argue that the provisions of the Pennsylvania Act, other than the 20-day waiting period provision, are indeed consistent with the provisions of the Williams Act. Defendants contend that, on this point, *Kennecott* is inapposite, pointing to the following language in the *Kennecott* court's opinion: "Our decision here, in the context of a preliminary injunction motion, is a limited one. We have held no more than that the New Jersey provisions delaying 'commencement' of a tender offer beyond the five-day period conflict with the SEC regulations promulgated under the Williams Act." *Kennecott Corp. v. Smith, supra,* 637 F.2d 181 [Current] CCH Fed.Sec. L.Rep. ¶ 97,731, at 98,838.

The Court holds, however, that Crane has demonstrated a reasonable probability of success on the merits of this claim as well. First, the only two courts of appeals to have addressed the issue have held similar state takeover laws to be preempted by the Williams Act. *See MITE Corp. v. Dixon,* 633 F.2d 486, [Current] CCH Fed.Sec.L.Rep. ¶ 97,660, at 98,494 (7th Cir. 1980) (Illinois takeover law); *Great Western United Corp. v. Kidwell,* 577 F.2d 1256 (5th Cir. 1978) (Idaho takeover law), *rev'd on other grounds sub nom.; Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) (improper venue).

Secondly, the legislative history of the Williams Act further supports the Court's holding. The Williams Act was designed to close a gap in federal securities regulation which left tender offers virtually unregulated. The House Report described the problems existing prior to the enactment of the Williams Act as follows:

[B]y using a cash tender offer the person seeking control can operate in almost complete secrecy. At present, the law does not even require that he disclose his identity, the source of his funds, who his associates are, or what he intends to do if he gains control of the corporation. As a practical matter, unless incumbent management explains its position publicly, the investor is severely limited in obtaining all of the facts on which to base a decision whether to accept or reject the tender offer.

H.Rep.No.1711, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad. News 2811, 2812 ("House Report"). With the passage of the Williams Act, tender offers, which had become increasingly popular, became subject to registration and disclosure requirements similar to those governing other transactions in securities. In *Kidwell, supra*, the Fifth Circuit succinctly described the purpose of the Williams Act as follows:

The underlying purpose of the Williams Act is to protect investors.... Congress chose this goal in the Williams Act and adopted a distinct means of achieving it. Essentially, Congress relied upon a "market approach" to investor protection. *The function of federal regulation is to get information to the investor by allowing both the offeror and the incumbent managers of a target company to present fully their arguments and then to let the investor decide for himself.*

*Great Western United Corp. v. Kidwell, supra*, at 1276 (emphasis added) (citations and footnotes omitted). *See also Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 22–24, 97 S.Ct. 926, 939–40, 51 L.Ed.2d 124 (1977); *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975); *Kennecott Corp. v. Smith, supra*, 637 F.2d 181 [Current] CCH Fed.Sec.L.Rep. ¶ 97,731, 98,835; *MITE Corp. v. Dixon, supra*, 633 F.2d 486 [Current] CCH Fed.Sec.L. Rep. ¶ 97,660, at 98,498.

The legislative history further demonstrates that, in enacting the Williams Act, "Congress was ... committed to a policy of neutrality in contests for control." *Piper v. Chris-Craft Industries, Inc., supra*, 430 U.S. at 29, 97 S.Ct. at 943. This is reflected in the House Report:

It was urged during the hearings that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management. It was also recognized that these bids are made for many other reasons, and do not always reflect a desire to improve the management of the company. *The bill avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case.*

House Report, *supra, reprinted in* [1968] U.S.Code Cong. & Ad.News at 2813 (emphasis added). However, legislation such as the Pennsylvania Act upsets the congressionally designed balance by creating the possibility of delay in the commencement and the consummation of the tender offer. While the hearings authorized by the Pennsylvania Act are underway, and the tender offer is suspended, the management of the target company can take any of a number of steps, fully described in other cases, to scuttle the offer. *See Kennecott Corp. v. Smith, supra*, 637 F.2d 181 [Current] CCH Fed.Sec.L.Rep. ¶ 97,731, at 98,836; *MITE Corp. v. Dixon, supra*, 633 F.2d 486 [Current] CCH Fed.Sec. L.Rep. ¶ 97,660, at 98,502; *Great Western United Corp. v. Kidwell, supra*, at 1277–1278. Such a result is inconsistent with the scheme of the Williams Act.

Defendants, however, contend that the Pennsylvania Act fully comports with con-

gressional objectives. They emphasize the Supreme Court's statement that "[t]he legislative history thus shows that the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Piper v. Chris-Craft Industries, Inc., supra*, 430 U.S. at 35, 97 S.Ct. at 946. They also note the Supreme Court's statement that "[n]eutrality is . . . but one characteristic of legislation directed toward a different purpose—the protection of investors." *Id.* at 29, 97 S.Ct. at 943. Therefore, defendants argue, a statute such as Pennsylvania's which accords an investor greater protection only *furthers* the narrow congressional objective. Defendants contend that the Pennsylvania Act confers additional protection by authorizing the Pennsylvania Commission to order a hearing on the adequacy of the offeror's disclosures which suspends the tender offer. The hearing thereby arguably ensures complete disclosure and provides shareholders more time to consider whether to tender their shares. *See* Note, *Securities Law and the Constitution: State Tender Offer Statutes Reconsidered*, 88 Yale L.Rev. 510, 521–525 (1979).

However, the legislative history of the Williams Act demonstrates that Congress considered whether such delay confers necessary protection or imposes unwarranted obstacles. That legislative history demonstrates that Congress decided tender offers "were not to be hindered (by grossly extended delay under state law) to the detriment of investors." *MITE Corp. v. Dixon, supra*, 633 F.2d 486 [Current] CCH Fed.L. Rep. ¶ 97,660, at 98,503. *See also Great Western United Corp. v. Kidwell, supra*, at 1279. The Supreme Court's opinion in *Piper* does not compel a different result. The question before the Court in *Piper*—whether the Williams Act confers a private right of action upon defeated offerors—was altogether different. The *Piper* Court's objective was to determine *who* the Williams Act was designed to protect, and the Court concluded that the Williams Act was intended only to protect shareholders, not offerors. The *Piper* Court thus had no occasion to consider whether the neutral approach to

tender offers adopted by Congress in the Williams Act was intended to establish a federal policy of neutrality with which the states cannot interfere. This Court agrees with the courts in *MITE* and *Kidwell* that the Williams Act was so intended.

Defendants argue, however, that *MITE* and *Kidwell* must be distinguished. Defendants point out that *MITE* involved a state statute which authorized the state securities commission to conduct hearings on whether "the take-over offer is inequitable," and that *Kidwell* involved a state statute which *required* the state securities commission to hold a hearing if the target company requested one. Defendants argue that the Pennsylvania Act, which does not contain such provisions, does not pose the same risks of excessive paternalism or delay. These qualitative differences are insufficient to cause the Court to reach a different result. The very potential for substantial interference, inherent in the hearing provisions of the Pennsylvania Act, conflicts with the objectives of the Williams Act by unnecessarily discouraging tender offers. Moreover, since the provisions exist, they may be employed. The harm of delay imposed by a hearing is, as the Court has already discussed, precisely the harm Congress sought to avoid.

### (2) *The Commerce Clause*

The Commerce Clause provides that "the Congress shall have the Power . . . to regulate Commerce with foreign Nations, and among the several States." U.S.Const., Art. I, § 8, cl. 3. The Supreme Court recently reiterated that, "[a]lthough the Clause . . . speaks in terms of powers bestowed upon Congress, the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade." *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 33, 100 S.Ct. 2009, 2014, 64 L.Ed.2d 702 (1980). *See also Minnesota v. Clover-Leaf Creamery Co.*, —— U.S. ——, ——, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 (1981). Whether the Commerce Clause of its own force prohibits particular state legislation is determined by a balancing test:

Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). *Accord, Minnesota v. Clover-Leaf Creamery Co., supra,* —— U.S. at ——, 101 S.Ct. at 715.

For the reasons stated below, the Court holds that the plaintiff has demonstrated a substantial likelihood of success on the merits of its claim that the burdens imposed upon interstate commerce by the Pennsylvania Act outweigh the putative local benefits.

### (a) *Local Benefits*

Defendants argue that the Pennsylvania Act furthers two legitimate state interests: (1) the protection of investors; and, (2) the regulation of the internal affairs of domestic corporations and corporations with substantial assets and their principal place of business within the state. Defendant's Memorandum, at 34. Despite contrary language in the body of the statute,[2] the defendants also maintain that the Pennsylvania Act was not intended merely to protect management of in-state corporations from attack from out-of-state corporations. For purposes of this motion, the Court will assume that merely protectionist motives did not inspire the legislation.

The Court agrees that the protection of investors is a legitimate state interest, but only to the extent those investors reside in Pennsylvania. However, while the Pennsylvania Act does purport to protect investors, the delay resulting from the invocation of the provisions of the Act may, as discussed above, cause more harm than good. As the court declared in *MITE Corp. v. Dixon, supra,* "the benefits flowing to [the state's] shareholders from the Act are, to a significant degree, speculative." *Id.,* 633 F.2d 486 [Current] CCH Fed.Sec.L.Rep. ¶ 97,660, at 98,505.

The defendants also urge that the state has a legitimate interest in "insuring that ownership, management, or control does not change precipitously as a result of false, misleading or fraudulent representations to shareholders." Defendant's Memorandum, at 35. In the first place, defendants' argument, as stated, fails to suggest any state interest in governing the internal affairs of in-state corporations other than the protection of investors, which has already been discussed. The only conceivable, nonprotectionist state interest which could support such legislation on the basis of the situs of incorporation or the principal place of business is a state's arguable interest in attracting investment capital to the state by ensuring investors that their investments will be protected from abuse.

Although these state interests are either weak or tenuously served by the Pennsylvania Act, they are nevertheless legitimate. The Court then turns to a consideration of the Pennsylvania Act's attendant burdens on interstate commerce.

### (b) *Burdens on Commerce*

The principal burden imposed upon interstate commerce by the Pennsylvania Act is its potential disruption of a major securities transaction. Plaintiff notes that the aggregate value of the offer is some 55 million

2. Section 2 of the Pennsylvania Act provides as follows:

It is hereby determined and declared as a matter of legislative finding that legislation is necessary *to provide adequate protection for Pennsylvania corporations,* shareholders, and employees and the public from the use of takeover offers without full and fair disclosure of information concerning them.
Pa.Stat.Ann., tit. 70, § 72 (Purdon Supp. 1980–1981) (emphasis added).

dollars. The offer is directed to more than 12,815 persons—shareholders of Harsco—located throughout the United States. Yet, should the Pennsylvania Commission elect to order a hearing, the entire transaction—nationwide—will be halted for the duration of the hearing. That process may run as long as 60 days. During that time, shareholders ready and willing to tender their shares will be prevented from consummating the bargain, no matter where they reside. Such interference is indeed a most severe burden on interstate commerce. *See MITE Corp. v. Dixon, supra,* 633 F.2d 486 [Current] CCH Fed.Sec.L.Rep. ¶ 97,660, at 98,506.

Moreover, the Pennsylvania Act purports to regulate tender offers where the target company is organized under Pennsylvania law or has its principal place of business and substantial assets located within Pennsylvania. *See* Pa.Stat.Ann., tit. 70, § 73 (Purdon Supp. 1980–1981) (definition of "Target company"). Thus, as written, the law would apply to a tender offer for shares of a company without a single Pennsylvania shareholder.

Another burden on interstate commerce is the serious danger of conflict with other states' tender offer statutes.[3] *See MITE Corp. v. Dixon, supra,* 633 F.2d 486 [Current] CCH Fed.Sec.L.Rep. ¶ 97,661, at 98–506; *Great Western United Corp. v. Kidwell, supra,* at 1284–1285. *See also* Tiger, *The Pennsylvania Takeover Disclosure Law: A Statute Waiting to be Invalidated,* 25 Vill.L.Rev. 458, 482 (March 1980). Although such statutes may conceivably conflict in many respects, two possible points of conflict deserve special attention.

First, both the Williams Act and the Pennsylvania Act provide that shares tendered in response to a tender offer may be withdrawn by the tendering shareholder within seven days of the commencement or effective date of the offer. *See* 15 U.S.C. § 78n(d)(5); Pa.Stat.Ann., tit. 70, § 77(a) (Purdon Supp. 1980–1981). Thus, a shareholder who responds hastily to a tender offer has an opportunity to reconsider his or her action. Secondly, both the Williams Act and the Pennsylvania Act provide that, where an offeror makes a tender offer for less than all of the outstanding shares, and the number of shares tendered within the first 10 days of the offer exceeds the number of shares sought, then the offeror must take up those shares tendered pro rata. 15 U.S.C. § 78n(d)(6); Pa.Stat.Ann., tit. 70, § 77(b) (Purdon Supp. 1980–1981). Thus, shareholders acting promptly will receive at least a proportionate share of the benefits they expected, and the offeror is not free to pick and choose among tendering shareholders to make up the number of shares sought.

It is true that the time periods during which these "withdrawal" and "pro rata acceptance" rights exist under the Williams Act and the Pennsylvania Act coincide. However, if another state's tender offer statute should apply prescribing *different* time periods for "withdrawal" and "pro rata acceptance" rights, compliance would be difficult or impossible.

For example, Delaware's statute would appear to require *pro rata* acceptance for shares tendered within the first *20* days of the tender offer. *See* Del.Code tit. 8, § 203(a)(3). If a different number of shares has been tendered at the end of 20 days than were tendered at the end of 10, then two different fractions would purportedly govern the pro rata acceptance. Compliance would be impossible.[4]

---

3. Indeed, although Crane has not argued the point in this Court, Crane's tender offer may also be subject to the provisions of the Delaware statute regulating tender offers. *See* Del. Code tit. 8, § 203(c)(2) (Supp.1978) (statute governs tender offers made to more than 30 shareholders of corporations organized under Delaware law).

4. Suppose that, at the end of 10 days, shareholders holding 2.0 million shares of Harsco had tendered their shares, while at the end of 20 days shareholders holding 2.4 million shares of Harsco had tendered. Under the Pennsylvania Act, the shareholders tendering in the first 10 days would be entitled to have 80% of their tendered shares accepted. Under Delaware law, however, the same shareholders would be entitled to have only 66⅔% of their tendered

### (c) The Burdens are Excessive

Crane has sustained its burden of showing that there is a probability of success on the merits of its claim that the burdens imposed by the Pennsylvania Act are excessive. The interests advanced in support of the Act are, as the Court has stated, either weak or speculatively served by the legislation. In their name, the Pennsylvania Act threatens to wholly disrupt securities transactions which would potentially be of great value to shareholders of target companies. Moreover, there is the burden of subjecting offerors to civil and criminal penalties for failure to comply with wholly irreconcilable state statutes. *See, e. g.,* Pa.Stat.Ann., tit. 70, §§ 82, 83 (Purdon Supp. 1980–1981). Such burdens are, in the Court's view, clearly excessive in relation to the putative local benefits. In so holding, the Court notes that it is in accord with the only two courts of appeals to have addressed this issue. *See MITE Corp. v. Dixon, supra,* 633 F.2d 486 [Current] CCH Fed.Sec.L.Rep. ¶ 97,661, at 98,506; *Great Western United Corp. v. Kidwell, supra,* at 1285–1286. *See also* Tiger, *supra,* at 483–485.

### (B) Irreparable Harm

The Third Circuit stated in *Kennecott* that "[a]nalysis of the merits and the question of irreparable injury are closely linked in the situation presented by the appeal at hand." *Kennecott Corp. v. Smith, supra,* 637 F.2d 181 [Current] CCH Fed.Sec.L.Rep. ¶ 97,731, at 98,836. That statement applies with equal force to the case at bar.

In *Kennecott,* the Third Circuit held that delay in distributing information about the tender offer as provided for by the Williams Act constituted irreparable harm. That court stated that "the target's management can use the period of delay to send materials to the shareholders in order to discourage them from tendering their stock." *Kennecott Corp. v. Smith, supra,* 637 F.2d 181 [Current] CCH Fed.Sec.L.Rep. ¶ 97,731, at 98,836. Furthermore, "[d]uring the period of delay the management may also resort to defensive maneuvers designed to deprive the shareholders of their free choice. Common defensive tactics include arranging a "friendly" merger, increasing dividends, or abolishing cumulative voting." *Id.*

The *Kennecott* court also noted that delay harms the offeror as well. First, the offeror may incur substantial unrecoverable financial costs:

> When the offeror has borrowed funds to support the offer, it must make interest payments for each day that the offer is extended.... The offeror may also have to forego its right to earn interest on the money that it must hold in reserve, because were it not for the outstanding offer these funds could be invested at the current high interest rates.

*Id.* 637 F.2d 181 [Current] CCH Fed.Sec.L. Rep. at 98,837 (citation omitted). Moreover, "[d]elay augments the possibility that the offer will not be completed successfully—not through adverse action of the shareholders, as Congress contemplates, but through barriers erected by the target management." *Id.* (citation omitted).

Although the *Kennecott* court was analyzing the irreparable harm resulting from the Pennsylvania Act's waiting-period provision, this Court sees no reason why the same harms are not implicated by the statute's remaining provisions. Whether the delay occurs before or after shareholders have received information about the tender offer, delay affords the target company an opportunity to disrupt the transaction and, therefore, constitutes irreparable harm supporting injunctive relief.

### (C) Public Interest and Harm to Third Parties

As to the remaining factors, the Court can do no better than quote the Third Circuit:

shares accepted. Unless Crane accepts more shares than it contemplated purchasing in its

offer, Crane cannot comply.

792

As for the public interest factor, Congress has declared what procedure is most salutory in tender offer situations. We are obligated to observe the congressional policy choice. Federal policy also guides our analysis of the final element—the weighing of the respective harms. In the view of Congress, shareholders will be disadvantaged by delayed disclosure. Although it may be counter to the interest, in a sense, of the target company, or at least its incumbent management, if the tender offer comes to fruition consistent with federal law, this is not the type of "harm" that Curtiss-Wright is entitled to be shielded from under the Williams Act.

*Kennecott Corp. v. Smith, supra,* 637 F.2d 181 [Current] CCH Fed.Sec.L.Rep. ¶ 97,731, at 98,837–98,838.

For all of the reasons stated above, the Court holds that Crane has made the showing required to support an order granting its motion for a preliminary injunction against the enforcement of the Pennsylvania Act in respect to its tender offer. This Court so ordered on February 4, 1981.